UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Tanya R.,<br><br>                    Plaintiff,<br><br>-against-<br><br>Commissioner of Social Security,<br><br>                    Defendant. | 1:24-cv-09076 (SDA)<br><br>OPINION AND ORDER |

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Tanya R. ("Tanya" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Now before the Court is Plaintiff's motion for judgment on the pleadings. (Pl.'s 5/8/25 Mot., ECF No. 14.) For the reasons set forth below, Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED.

**BACKGROUND**

**I.    Procedural Background**

Tanya filed an application for DIB and SSI on May 7, 2019, with an alleged onset date ("AOD") of December 2, 2017.[1] (R. 104-05.) The SSA initially denied her application on September

---

[1] Tanya previously had filed an application for DIB and SSI on October 5, 2015, with an alleged AOD of October 1, 2015. (R. 67.) The Social Security Administration ("SSA") denied her application on November 25, 2015. (*Id.*) Following a hearing, in a decision dated December 6, 2017, ALJ Allen found Tanya not disabled. (R. 67-78.) Thereafter, Tanya requested review of the ALJ's decision by the Appeals Council, which denied the request on September 14, 2018. (R. 83-88.) On November 5, 2018, Tanya commenced

5, 2019, and again, following her request for reconsideration, on November 26, 2019. (R. 10.) On December 4, 2019, Tanya filed a request for a hearing before an ALJ. (*Id.*) A telephonic hearing was held on June 24, 2020, before ALJ Seth Grossman. (*Id.*) Tanya was represented at the hearing by Daniel Berger, Esq. ("Attorney Berger"). (*Id.*)

In a decision dated August 6, 2020, ALJ Grossman found Tanya not disabled. (R. 10-21.) Thereafter, Tanya requested review of the ALJ's decision by the Appeals Council. (R. 1.) The Appeals Council denied the request on December 18, 2020. (R. 1-3.)

On February 15, 2021, Tanya commenced an action in this Court, No. 21-CV-01320. By stipulation of the parties, on January 14, 2022, the matter was remanded to the Commissioner for further administrative proceedings. (R. 844.) On June 27, 2022, the Appeals Council issued an Order requiring the ALJ on remand to address issues regarding the prior hearing decision. (R. 804-06.)

Non-substantive hearings were held by ALJ Grossman on November 3, 2022, July 24, 2023, and March 4, 2024. (R. 777-801.) A final hearing was held by ALJ Grossman on June 17, 2024, at which Tanya was represented by David Levine, Esq. (R. 758.) At this final hearing, two medical experts and a vocational expert ("VE") testified. (761-74.)

On September 10, 2024, ALJ Grossman issued a decision finding Tanya not disabled. (R. 735-57.) On November 16, 2024, Attorney Berger, on behalf of Tanya, commenced the current action, asserting that ALJ Grossman's September 10, 2024 decision was erroneous, not supported

---

an action in this Court, No. 18-CV-10247, which was voluntarily dismissed without prejudice on April 10, 2019. (R. 102-03.)

by substantial evidence and/or contrary to the law.[2] (Compl., ECF No. 1, ¶ 8.) On May 8, 2025, Tanya filed the motion now before the Court. (*See* Pl.'s 5/8/25 Mot.) On July 9, 2025, the Commissioner's opposition brief was filed. (Comm'r's Br., ECF No. 17.) On July 30, 2025, Tanya's reply memorandum was filed. (Pl.'s Reply Mem., ECF No. 18.)

## II.    Non-Medical Evidence

Born on August 23, 1975, Tanya was 42 years old on the AOD and 48 years old at the time of the ALJ hearing. (R. 19.) Tanya attended school through the eleventh grade but does not have a high school diploma. (R. 77, 117.) Tanya worked as a manager at Bethel Nutritional, a nutritionist's office, for twenty-three years.[3] (R. 58, 117, 307, 382.)

## III.    Medical Evidence Before the ALJ

### A.    Psychiatric Treatment Prior To December 2, 2017 AOD

On November 4, 2014, Tanya was referred to Fernando Taveras, M.D., by her primary care provider, Cheng Gonjon, M.D., for an emergency medical intervention to treat an unspecified anxiety disorder. (R. 552.) Dr. Taveras reported increasing Tanya's doses of Clonazepam and Paxil and starting her on Ambien to treat insomnia. (*Id.*)

On January 26, 2015, Tanya was referred to Gerardo Tapia, M.D., by Dr. Gonjon for a psychiatric evaluation due to panic problems. (R. 382.) Dr. Tapia noted that Tanya was sobbing,

---

[2] The September 10, 2024 decision constitutes the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(d) ("If no exceptions are filed and the Appeals Council does not assume jurisdiction of your case, the decision of the administrative law judge or administrative appeals judge becomes the final decision of the Commissioner after remand.").

[3] At the June 24, 2020 hearing, Tanya described her job as a manager position. (R. 58 ("I was the manager there. I was the one bringing people in, taking their vital signs, putting them in the computer . . .").) At that same hearing, vocational expert Zachary Fosberg ("VE Fosberg") classified the position as "weight reduction specialist." (R. 59.)

nervous, had sweaty hands and an increased heart rate, appeared sad and frustrated, and reported losing 15 pounds. (*Id.*) Tanya reported that her symptoms started in August 2014, after her husband, with whom she had been in an eight-year abusive relationship and from whom she was separated, had robbed and hit her. (*Id.*) Dr. Tapia diagnosed Tanya with recurring moderate major depressive disorder, and prescribed Buspirone, Mirtazapine and Alprazolam. (R. 383.)

On January 6, 2017, Tanya was transferred from Dr. Bebsy Estefan, M.D., whom she had been seeing since September 2014, to Dr. Taveras. (R. 569.) Tanya reported that she was very sad, with low self-esteem, crying and mood swings, and had not been socializing. (*Id.*) In the year between this initial transfer and the AOD, Tanya was seen approximately twice a month, first by Dr. Taveras and then, after April 11, 2017, by Giovanny Nunez, M.D., to whom Tanya was transferred within the same practice after she stated a preference for seeing a female psychiatrist. (R. 569-99.) During this period, Tanya's self-assessments and the corresponding evaluating psychiatrists' reports varied, from mild stress, anxiety and apprehension to allegedly severe anxiety episodes, brought on by the father of her child wanting to take her to family court (R. 572), the death of a friend by suicide (R. 580, 583) and the wait for approval of her social security benefits. (R. 597.) These were interspersed with intermittent reports that Tanya was feeling better and more positive and appeared calm, cooperative and stress-free at her appointments. (R. 571, 575, 578, 587-95.)

**B.**     **December 2017 Through November 2022 Psychiatric Treatment**

On December 4, 2017, Tanya reported experiencing an episode of panic attacks at a family celebration, stating that her visit lasted no more than 15 minutes before the onset of symptoms, triggered by the crowdedness of the location. (R. 600.) Tanya reported that her anxiety symptoms

4

had continued, and her feelings of apprehension had worsened. (*Id.*) On mental status examination, Dr. Nunez reported that Tanya appeared attentive, communicative and cooperative, with an affect appropriate to verbal content. (*Id.*)

At follow-up appointments on December 19, 2017, and January 22, 2018, Tanya reported doing well, and Dr. Nunez noted that her mood was euthymic, and she appeared calm, cooperative and in good control of her behavior. (R. 601-03.) On mental status examination, Dr. Nunez reported that Tanya appeared friendly, communicative and appropriately groomed. (*Id.*)

On January 29, 2022, Tanya reported more frequent or intense stress-related symptoms, including increased feelings of anxiety, excessive worrying and apprehension, and increased uncomfortable sensations of excessive motor tension. (R. 605.) On mental status examination, Dr. Nunez reported Tanya appeared friendly, attentive and communicative, with an affect appropriate to verbal content. (*Id.*)

At a follow-up appointment on February 20, 2018, Tanya reported doing well, and Dr. Nunez noted that her mood was euthymic, and she appeared calm, cooperative and in good control of her behavior. (R. 606.) On mental status examination, Dr. Nunez reported Tanya appeared friendly, communicative and appropriately groomed. (*Id.*) Again, at an appointment on February 26, 2018, Tanya reported no stress-related or depressive symptoms, commenting, "Finally, I am doing well." (R. 608.)

On March 20, 2018, Tanya reported doing poorly, as her grandmother had died two days earlier. (R. 609.) Dr. Nunez noted that although Tanya was tearful, she seemed to be handling the loss appropriately. (*Id.*) On March 26, 2018, Dr. Nunez continued to observe anxiety symptoms, noting that Tanya felt apprehensive, and reported uncomfortable sensations of excessive motor

tension. (R. 611.) Tanya remained preoccupied with her grandmother's death, commenting, "I am afraid of having a terminal illness." (*Id.*) The following month, on April 19, 2026, Tanya continued to be slightly anxious and tense, although the feelings had abated somewhat. (R. 612.)

In two following appointments, on May 17, 2018 and June 14, 2018, Tanya reported stability and no new symptoms. (R. 613-15.) On mental status examination, Dr. Nunez noted Tanya's dress and grooming were appropriate, and she was friendly and communicative, with no signs of anxiety. (*Id.*)

On June 21, 2018, Tanya continued to exhibit signs of stress and anxiety, reporting that she was thinking of canceling an upcoming trip to Orlando because she was afraid of the plane. (R. 617.) On mental status examination, Dr. Nunez noted that Tanya was attentive, communicative and well-groomed, but appeared anxious. (*Id.*) At a follow-up appointment on July 16, 2018, Dr. Nunez noted that Tanya once again appeared calm, cooperative and in good control of her behavior, with a euthymic mood. (R. 618.)

On July 23, 2018, Tanya reported that she had taken the trip to Orlando and everything went well, but when she had returned to New York her anxiety symptoms and feelings of apprehension had worsened, with an increase in uncomfortable sensations of excessive motor tension. (R. 620.) On mental status examination, Dr. Nunez reported that Tanya appeared friendly, distracted and communicative, with an affect congruent with her mood. (*Id.*)

Over three appointments on August 16, August 27 and September 20, 2018, Tanya reported a period of stability, commenting, "For the first time in a long time, I am feeling better." (R. 621-25.) On mental status examination, Dr. Nunez noted that Tanya's dress and grooming were appropriate, and her mood appeared brighter and calmer. (*Id.*)

On September 26, 2018, Tanya reported disappointment in reaction to the second denial of her social security benefits, and excessive worrying and anxiety due to her close friend dying of breast cancer. (R. 627.) She reported symptoms associated with significant stress. (*Id.*) On mental status examination, Dr. Candida Cartagena, a therapist filling in for Dr. Nunez, reported that Tanya appeared friendly and communicative, with a normal mood and appropriate affect. (*Id.*) In a follow-up appointment on October 18, 2018, Dr. Nunez reported that Tanya was doing well and appeared calm, cooperative and in good control of her behavior, with a euthymic mood. (R. 629.)

On October 24, 2018, Tanya reported that her anxiety and stress-related symptoms had worsened, and complained of fatigue, commenting, "I feel very anxious and I don't want to feel like that." (R. 633.) On mental status examination, Dr. Cartagena, filling in for Dr. Nunez, reported that Tanya appeared friendly, attentive and communicative, with an affect appropriate to verbal content. (*Id.*) In a follow-up appointment on November 13, 2018, Dr. Nunez reported Tanya was doing well, with a euthymic mood. (R. 635.)

In two successive appointments, on December 11 and December 17, 2018, Tanya reported being stressed and appeared anxious, scared, tense and tearful, because someone allegedly had tried to kidnap her six-year-old son. (R. 637-39.) Tanya claimed her son's father had problems in the streets, that someone went to her son's school and tried to remove him from school, and that she had since moved her son to a different school in Yonkers. (*Id.*) She claimed she went to the police, but they told her they could not help her because her son was not kidnapped. (R. 639.) On mental status examination, Dr. Nunez reported that Tanya appeared glum, wary and attentive, with signs of moderate depression. (*Id.*)

At a follow-up visit on January 17, 2019, Tanya reported feeling stable, with no new symptoms. (R. 641.) On mental status examination, Dr. Nunez reported that Tanya appeared friendly and communicative, with a euthymic mood. (*Id.*)

On February 7, 2019, Tanya reported panic attacks, with symptoms occurring mostly at nighttime. (R. 643.) Dr. Cartagena, filling in for Dr. Nunez, reported that Tanya appeared friendly, communicative and attentive, with an appropriate affect. (*Id.*)

In follow-up visits on February 18, March 18, April 4, April 18 and May 2, 2019, Tanya appeared stable. (R. 645-54.) At her April 4, 2019 appointment, Tanya reported a recent asthma attack. (R. 649.) Otherwise, Tanya reported no further stress- or trauma-related symptoms, and her mood was reported as bright, calm and euthymic. (R. 649, 651.)

In a letter dated May 3, 2019, Dr. Nunez confirmed a diagnosis of anxiety disorder, panic disorder and agoraphobia. (R. 399.) Dr. Nunez reported that Tanya had been treated for these conditions with psychotherapy and medication management, including prescriptions of Ambien, Clonazepam, Seroquel and Zoloft. (*Id.*) Dr. Nunez stated that Tanya needed ongoing psychiatric treatment and, in her sign-off, stated, "If you need further information, please contact this office with a written consent." (*Id.*)

At an appointment on May 20, 2019, Tanya reported feeling very saddened by the death of a friend two weeks earlier. (R. 655.) Dr. Nunez observed that she was tearful and sad, but appeared to be handling the loss appropriately. (*Id.*) Dr. Nunez further reported that Tanya appeared glum, wary and attentive, with signs of moderate depression. (*Id.*)

On June 10, 2019, Tanya reported that she was continuing to experience panic attacks, accompanied by sensations of shortness of breath and smothering. (R. 668.) She reported only

8

going outside to drop her son off at school, and to attend medical appointments. (*Id.*) On mental status examination, Dr. Nunez observed that Tanya appeared friendly, attentive and communicative, but anxious. (*Id.*)

On June 20, 2019, Tanya appeared very upset, once again claiming that a man tried to take her son out of school. (R. 657.) She again said she had gone to the police to report the incident, but could not press charges because her son had not been taken out of school. (*See id.*) On mental status examination, Dr. Nunez reported that Tanya was glum, wary and attentive, with mild signs of depression. (*Id.*)

On July 9, 2019, Tanya reported that her son's father had reported her to the New York Administration for Children's Services ("ACS") "for no reason," and that she was afraid of him because he "just want to take my son away from me." (R. 659.) Tanya also reported that her stress-related symptoms were ongoing. (*Id.*) On mental status examination, Dr. Cartagena, filling in for Dr. Nunez, observed that Tanya was tearful and appeared anxious. (*Id.*) Dr. Cartagena observed that signs of mild depression were present, and Tanya's affect was constricted. (*Id.*)

In two follow-up appointments, on July 23 and August 21, 2019, Tanya reported improvement and stability. (R. 661-64.) Dr. Nunez reported that her mood was brighter and calmer, and that she appeared in good spirits. (*Id.*)

At an appointment on August 29, 2019, Tanya claimed that "her life and the life of her little boy could be in danger because of her son's father['s] wrongdoing." (R. 672.) According to Tanya, her son's father was "running away from his enemies." (*Id.*) She again stated that someone had attempted to kidnap her son from school. (*Id.*) Tanya exhibited excessive worrying and anxiety-related symptoms, saying she was scared "now that school is about to start." (*Id.*) On

mental status examination, Dr. Cartagena, filling in for Dr. Nunez, reported that Tanya was friendly, attentive, communicative and coherent. (*Id.*)

At a follow-up appointment on September 23, 2019, Tanya appeared to be doing much better, her mood brighter. (R. 691.) She denied acute stress. (*Id.*) Dr. Nunez reported no gross abnormalities in her mental status. (*Id.*)

At an appointment on October 10, 2019, Tanya reported the continuation of her anxiety-related symptoms, with an increase in frequency and intensity. (R. 674.) She reported feelings of frustration and sadness, and complained of trembling and shaking. (*Id.*) On mental status examination, Dr. Cartagena, filling in for Dr. Nunez, observed that Tanya appeared sad and distracted, with a depressed mood and content and a constricted affect. (*Id.*)

On November 7, 2019, Tanya again reported worsening feelings of stress, anxiety and apprehension, with symptoms that were unchanged in frequency or intensity. (R. 676.) She reported that she continued to avoid certain situations that made her anxious and caused shortness of breath. (*Id.*) Tanya also reported uncomfortable sensations of excessive motor tension. (*Id.*) On mental status examination, Dr. Cartagena, filling in for Dr. Nunez, reported that Tanya appeared glum, sad and distracted. (*Id.*)

At an appointment on January 9, 2020, Tanya again stated that her son's father had reported her to ACS, but "there [was] no reason for her to be scare[d] because she takes good care of her son." (R. 719.) Despite this, Tanya continued to describe multiple psychosocial stresses, and Dr. Nunez reported that she appeared to have a hard time coping and her reaction was intensified. (*Id.*) She also expressed feelings of anger. (*Id.*)

At an appointment on February 6, 2020, Tanya reported no change in her feelings of apprehension. (R. 721.) She stated that she continued to avoid certain situations that would cause her anxiety. (*Id.*) She also reported no change in the uncomfortable sensations of excessive motor tension. (*Id.*) Dr. Cartagena, filling in for Dr. Nunez, reported on mental status examination that Tanya's behavior was cooperative and attentive and that her affect was appropriate. (*Id.*)

In appointments on February 18 and March 18, 2020, Tanya reported stability, with no new symptoms and a euthymic mood. (R. 1246-48.) However, in an appointment on April 19, 2020, she expressed mild anxiety due to the "current situation."[4] (R. 1250.)[5]

On April 28, 2020, Tanya reported she had not been outside since the pandemic was declared. (R. 1253.) She admitted to being extremely worried, and stated that she just wanted to keep her family safe. (*Id.*) Dr. Cartagena, filling in for Dr. Nunez, reported that Tanya was having a hard time coping and that her reaction was intensified. (*Id.*) Tanya was experiencing uncomfortable sensations of excessive motor tension, and heart-related symptoms were occurring when she was anxious. (*Id.*) In a follow-up on May 18, 2020, Tanya expressed "mild anxiety" due to the "current situation." (R. 1255.) Two appointments followed, on June 11 and July 16, 2020, at which Tanya reported stability. (R. 1258-62.)

On July 20, 2020, Tanya reported that her parents were both positive for COVID-19, making her extremely anxious. (R. 1263.) In a follow-up appointment on August 17, 2020, Tanya

---

[4] The Court construes this as a reference to the COVID-19 pandemic.

[5] From the April 19, 2020 appointment until the March 31, 2021 appointment, all appointments were conducted remotely. The following note accompanies each progress note: "This visit was completed via telephone/audio only due to the restriction of the COVID-19 pandemic. The patient does not have access to video call due to lack of internet service. Writer is calling from office. All issues as below were discussed and addressed but no physical exam was performed due to the limitations of an audio-only modality."

admitted to continuing concern about the pandemic and the future. (R. 1265.) On August 24, 2020, Tanya reported continuing panic attacks, accompanied by heart symptoms such as palpitations or pounding, and trembling or shaking. (R. 1267.) She also reported a sensation of shortness of breath or smothering, as well as choking, during panic attacks. (*Id.*) In a follow-up appointment on September 17, 2020, Tanya was reported as doing well, with a euthymic mood. (R. 1269.)

On September 21, 2020, Tanya reported symptoms of anxiety and apprehension, as well as episodes of tachycardia, rapid breathing and sweating. (R. 1271.) Tanya reported that she was helping her son with the computer, which was very stressful, and that she tended to avoid certain situations that might trigger her anxiety symptoms. (*Id.*) In follow-up appointments on October 15 and November 11, 2020, Tanya was reported as stable, with a euthymic mood. (R. 1273-76.)

On November 25, 2020, Tanya reported symptoms of significant stress and excessive worrying, stating that her public assistance case and food stamps had been suspended. (R. 1277.) In a follow-up appointment on December 9, 2020, she once again reported as doing well, with a euthymic mood. (R. 1279.) On December 21, 2020, Tanya also reported doing better "because I stay home. I get anxious when I go outside." (R. 1281.) She reported fewer stress- and frustration-related symptoms, and fewer problems associated with anger. (*Id.*) In a follow-up appointment on January 6, 2021, she again reported doing well. (R. 1283.)

On January 22, 2021, Tanya stated she was having problems paying her rent due to her public assistance case remaining closed, reporting sleep disturbances and symptoms of anxiety. (R. 1286.) In two follow-up appointments, on February 3 and March 3, 2021, Tanya presented as calm and cooperative. (R. 1289-94.)

In an appointment on March 5, 2021, Tanya once again reported issues with housing and finances, stating that her public assistance case and food stamps were closed several months ago. (R. 1295.) She reported worsening symptoms of anxiety and stress, with greater frequency and intensity. (*Id.*)

In monthly appointments between March 31, 2021, until November 22, 2022, Tanya presented with a brighter, calmer mood and stated she was feeling better. (R. 1298-1351.) Except for one appointment, on July 11, 2022, at which Tanya once again reported stress-related symptoms such as anxiety, fatigue and excessive worrying (R. 1341), Tanya exhibited stability, and good control of her behavior throughout. (R. 1298-1351.)

In a letter dated May 22, 2023,[6] Dr. Nunez confirmed that Tanya had been diagnosed with anxiety disorder and panic disorder, and that her treatment included psychotherapy and medication management. (R. 1364.) Dr. Nunez reported that the previous week, Tanya had told her that a fire next to her apartment had killed her grandmother and cousin. (*Id.*) In reaction, she was having daily panic attacks and extreme depression with anxiety. (*Id.*) Dr. Nunez recommended that Tanya be moved to a different location/apartment building for her safety and wellbeing, as the increased symptoms had been deteriorating to her. (*Id.*) Dr. Nunez also opined that Tanya's conditions were chronic and were expected to last indefinitely. (*Id.*)

---

[6] There are no records of treatment between Tanya's November 22, 2022 visit with Dr. Nunez and this letter from Dr. Nunez.

**C.**     **Physical Impairments**

**1.**     **July to August 2018 Treatment**

On July 6, 2018, Tanya visited the Columbia-Presbyterian Medical Center Emergency Department, complaining of difficulty swallowing. (R. 498.) Tanya reported that this occurred at around 4:00 p.m. every day, accompanied by dryness of the throat and heart racing. (*Id.*) She was examined and diagnosed with anxiety disorder. (*Id.*)

On October 21, 2018, Tanya returned to the Emergency Department, presenting with throat pain, chills and wheezing. (R. 502.) An examination yielded no evidence of upper airway obstruction or emergent process, and Tanya was released after being treated with a decongestant and non-steroidal anti-inflammatory drugs. (*Id.*)

On July 30, 2018, Tanya underwent an allergy evaluation with scratch testing at NYASC Allergy and Sinus Centers. (R. 385.) Tanya was diagnosed with allergic rhinitis and conjunctivitis. (*Id.*) Her treating physicians recommended she stay off prednisone for a month to see if the suppressed histamine was making the results indeterminate. (*Id.*) They recommended a trial of Xyzal and stated that Tanya's asthma and anxiety were causing her shortness of breath. (*Id.*) They recommended Breo and Symbicort if the symptoms worsened, as well as Albuterol. (*Id.*) Dr. Gonjon also recommended anxiety medication and a follow-up with a psychiatrist to practice relaxation techniques. (R. 386.)

**2.**     **May 2018 Through June 2018 Headache Treatment**

On May 2, 2018, after presenting with a headache, Tanya underwent a CT scan of the head without intravenous contrast, capturing axial images from skull base to vertex. (R. 514.) The

results showed no evidence of intraparenchymal hemorrhage, acute major territorial infarct, focal mass effect or significant midline shift. (*Id.*)

On June 4, 2018, Tanya visited Medalliance Medical Health Services ("Medalliance") for headache treatment. (R. 453-55.) She reported previously experiencing headaches once a week after an incident two years prior, in which part of a ceiling fell and hit her on the head, causing a head laceration that required treatment at Columbia Presbyterian Emergency Department, but no sutures. (*Id.*) Recently, however, she had been experiencing headaches every day, sometimes accompanied by nausea and dizziness with a spinning sensation. (*Id.*) The Tylenol she had previously taken to treat her headaches no longer relieved them. (*Id.*) The treating physician, Dr. Odette Davis, RPAC, ordered a Carotid doppler, a Transcranial doppler and an MRI without contrast of the brain. (*Id.*)

On June 6, 2018, Tanya visited Madison Avenue Radiology Center for an MRI of the brain without contrast. (R. 440.) The exam was incomplete due to Tanya's severe claustrophobia, so that only sagittal T1 and coronal T2 images were obtained. (*Id.*) The findings were normal for ventricles, cisterns, cervical tonsils and corpus callosum, with no evidence of a large mass lesion. (*Id.*) Further characterization of the brain was not possible in the absence of axial images, however, and Tanya was requested to return to undergo the diagnostic again, possibly on an open MRI. (*Id.*)

On June 12, 2018, Tanya returned to Madison Avenue Radiology Center for an MRI of the brain without contrast on an open magnet. (R. 441.) The findings were normal for cerebrum, cerebellum, ventricles and basal cisterns. (*Id.*) There was no acute infarct, bleed, mass effect or midline shift. The posterior fossa and bone marrow were unremarkable, and the visualized orbits

and sinuses were also normal. (*Id.*) The craniovertebral junction was within normal limits, and the diffusion weighted images were unremarkable. (*Id.*) The findings were normal for ventricles, cisterns, cervical tonsils and corpus callosum. (*Id.*)

On June 25 and August 14, 2018, Tanya returned to Medalliance to follow up on her test results and her headaches in general. (R. 448-52.) At her June 25 visit, it was noted that her MRI brain and CT angio head study results were normal. (R. 451.) At her August 14 visit, it was noted that she had had no headaches for a while and was working with a psychiatrist to manage her anxiety and panic attacks. (R. 448.) She was further requested to undergo videonystagmography and CD/TCD carotid and transcranial doppler tests, but could not travel to another location for the diagnostics due to her anxiety. (*Id.*) However, her condition was reported as improved, with no new symptoms and no pain. (*Id.*)

On October 16, 2018, Tanya returned to Medalliance for a follow-up visit, reporting headaches lasting for several days during her menstrual cycle. (R. 445.) She also reported experiencing generalized pain over her entire body, but more so at the ankles and wrists, and around the spine and shoulder area. (*Id.*) She also reported episodes of dizziness during which was felt like she might fall and pass out. (*Id.*) It was noted that some tests could not be performed because she experienced high levels of anxiety when taking public transportation and therefore could not travel to a second testing location. (*Id.*)

On November 20, 2018, Tanya returned to Medalliance for a follow-up visit, reporting infrequent headaches, only during her menstrual cycle. (R. 442.) The treating physician noted that she was continuing on Imitrex, which had been effective in treating her headaches, and Clonazapam for her anxiety. (*Id.*)

16

### 3.    November 2018 to May 2019 Spinal Treatment

On November 12, 2018, after complaining of lower back and pelvic pain for four years, Tanya underwent an X-Ray of the sacroiliac joints, at the order of Richard Gasalberti, M.D., of Medalliance. (R. 436.) These diagnostic examinations revealed no visible fracture or post-fracture deformity, preserved joint spaces and no osteophytes or erosive changes. (*Id.*)

Also on November 12, 2018, due to complaints of chronic neck pain and stiffness, Tanya underwent an MRI of the cervical spine without contrast, revealing no compression fractures or spondylolisthesia, but mild C5-6 disc space narrowing. (R. 437.) The right submandibular gland was absent or atrophic, with benign fatty infiltration. (*Id.*) The MRI also showed a small central rightward disc herniation at C4-5, and mild uncovertebral spurring. (*Id.*) At the remaining cervical levels, there was minimal disc bulging and no disc herniation. (*Id.*)

Also on November 12, 2018, Tanya underwent an MRI of the lumbar spine due to chronic lower back pain with bilateral lower extremity radiculopathy. (R. 438.) The examination revealed no compression fractures or spondylolisthesia, but mild L3-4 and L5-S1, and moderate L3-4 disc space narrowing with mild disc desiccation. (*Id.*)

At a follow-up visit to Medalliance on November 20, 2018, Tanya was identified as having cervical and lumber discogenic disc disease, but was reported as stable overall. (R. 442-44.) The treating physician reported that Tanya's back pain and headaches were under control, thanks to effective pain management, and that she would be reassessed in three to four months. (*Id.*)

On November 28, 2018, Tanya visited Medalliance for reevaluation. (R. 461.) Dr. Gasalberti performed a musculoskeletal/neurological examination. (*Id.*) On examination of the lumbar spine, Dr. Gasalberti reported that Tanya was able to trunk flex 0-70 degrees, and lateral

rotation was 0-5 degrees. (*Id.*) A straight leg raise was positive at approximately 0-40 degrees. (*Id.*) Deep palpation revealed lumbar paraspinal spasm and pain at the L4-5 and L5-S1 level. (*Id.*) On examination of the cervical spine, cervical motion to the right was 0-70 degrees, to the left was 0-70 degrees, and flexion and extension were 0-35 degrees. (*Id.*) Deep palpation revealed paracervical spasms at the CM and C6-7 level. (*Id.*) There was a functional range of motion of both the upper extremities, and manual muscle testing of both upper extremities was 5/5. (*Id.*) Deep tendon reflexes were noted to be 1+ at the biceps, triceps and brachioradialis. Dr. Gasalberti recommended that Tanya undergo EMG/nerve conduction studies of the upper extremities to electrophysiologically document them for cervical radiculopathy. (*Id.*) Dr. Gasalberti deemed it essential that Tanya attend an out-patient program to maintain joint mobility and muscle tone and to prevent further deterioration, including myofascial release techniques, heat massage to the cervical/lumbosacral spine, cervical/trunk stabilization technique, abdominal strengthening, and proper ergonomics/biometrics of lifting, sitting and standing. (*Id.*) He recommended Tanya undergo these types of therapies three times a week. (*Id.*)

On December 20, 2018, Tanya visited Medalliance for trigger point injections to treat her chronic neck pain. (R. 459.) Dr. Gasalberti noted the previous MRIs and their findings, as well as recent EMG/nerve conduction studies of the lower extremities on November 28, 2018, which demonstrated no evidence of lumbar radiculopathy or myofascial pain syndrome. (*Id.*) Noting that, because Tanya had failed conservative treatment, including analgesic medications, and her pain was impacting her quality of life, affecting her ability to sit, stand, walk and perform activities of daily living, Dr. Gasalberti administered trigger point injections to the gluteus maximus bilaterally. (*Id.*)

18

On January 9, 2019, Tanya had a follow-up visit for her lower back pain. (R. 431, 458.) She reported 80% improvement after the trigger point injections. (R. 458.) On May 22, 2019, Tanya complained of neck and back pain. (R. 426.) She was assessed with back pain at the L4-5 level, and was given a 1.3% transdermal 12-hour Flector patch. (*Id.*)

### 4.      December 2018 Through March 2019 Cardiovascular Treatment

On December 12, 2018, Tanya visited Medalliance for a cardiovascular consult after complaining of swelling in both ankles. (R. 410.) Tanya had also been experiencing arthritis, back pain and night cramps, as well as swelling in both legs. (R. 411.) Ian Lord, PAC, diagnosed her with idiopathic chronic venous hypertension of both lower extremities with inflammation and sent her for ABI testing,[7] among other testing. (*Id.*)

On February 4, 2019, Tanya visited Medalliance for a cardiovascular follow-up. (R. 407-09.) She reported pain, cramping and swelling in both medial calves. (R. 407.) The treating physicians, Corey Goldman, M.D. and PAC Lord, noted that Tanya had idiopathic chronic venous hypertension of both lower extremities with inflammation. (R. 408.) Tanya was instructed to use compression stockings and to elevate her legs. (*See id.*)

On March 13, 2019, Tanya again presented with bilateral leg swelling, cramping in the legs at night, itching and a heaviness sensation, along with bilateral heel pain and numbness of the left hand. (R. 403.) The treating physician, Carla Smith, RPAC, noted that Tanya had known C spin disc bulging, as well as reflux identified in the right superficial femoral vein junction lasting

---

[7] "The ankle-brachial index [or ABI] test compares the blood pressure in the ankle with the blood pressure in the arm. A low ankle-brachial index number can mean there is narrowing or blockage of the arteries in the legs." Mayo Clinic website, "Ankle-brachial index," https://perma.cc/Q9V4-JSG5 (accessed Mar. 22, 2026).

19

0.9 seconds, and in the left common femoral vein lasting 1.1 seconds. (*Id.*) RPAC Smith noted, however, that Tanya's ABI was normal. (*Id*.) Tanya again was instructed to wear compression stockings and to elevate her legs periodically. (R. 405.)

### 5.     March to May 2019 Neuropathy and Carpal Tunnel Treatment

On March 13, 2019, Tanya visited Medalliance for EMG/nerve conduction studies of the upper and lower extremities using a Cadwell Sierra Wave machine. (R. 465-69.) The left median motor and right median motor nerves showed prolonged distal onset latency, and the left median D2 sensory and the right median D2 sensory nerves showed prolonged distal onset latency and prolonged distal peak latency (R. 469.). The Left Ulnar Sensory and the Right Ulnar Sensory nerves showed prolonged distal peak latency. (*Id*.) All remaining nerves were within normal limits, and all examined muscles showed no evidence of electrical instability. (*Id.*) Dr. Gasalberti noted that the evidence of moderate bilateral sensorimotor axonal median neuropathy at the wrists was consistent with a clinical diagnosis of bilateral Carpal tunnel syndrome. (*Id.*)

At a follow-up visit with Dr. Gasalberti at Medalliance on May 22, 2019, Tanya underwent a second EMG/nerve conduction study, and results were compared to the prior study. (R. 523.) The study revealed persistent moderate bilateral sensory axonal median neuropathy at the wrists, consistent with bilateral carpal tunnel syndrome. (*Id.*)

### D.     Consulting Physicians

### 1.     August 12, 2019 Internal Medicine Consultative Examination – Dr. Ram Ravi, M.D.

On August 12, 2019, Tanya saw Dr. Ram Ravi for an internal medicine consultative examination. (R. 556-62.) Tanya noted her prior history of neck and back pain for four years, describing the pain as sharp and constant, and going down her left arm and left leg. (R. 557.)

Tanya also noted her history of asthma since 2014, stating that triggers were smoke and dust, but that she had never had any hospitalization or intubation, and she was currently asymptomatic and stable. (*Id.*) Upon physical examination, Dr. Ravi noted that Tanya had a moderately antalgic gate and was unable to walk on her heels or toes. (R. 558.) Tanya also declined to squat due to pain, had discomfort standing and declined getting on and off the exam table due to pain. (*Id.*) Upon musculoskeletal examination, Dr. Ravi noted that the cervical spine showed flexion 30 degrees, extension 20 degrees, rotation 40 degrees bilaterally, and lateral flexion 20 degrees bilaterally. (*Id.*) He noted that Tanya declined a lumbar spine examination and a straight-leg raising test due to pain. (*Id.*) Dr. Ravi also noted that Tanya exhibited shoulder forward elevation of 90 degrees bilaterally and abduction 90 degrees bilaterally. (R. 559.) She had full range of motion of the elbows, forearms and wrists bilaterally, but declined hip range of motion due to pain. (*Id.*) Her knee flexion and extension were both 75 degrees bilaterally, ankle dorsiflexion was 5 degrees bilaterally and plantar flexion 10 degrees bilaterally. (*Id.*) Dr. Ravi reported that Tanya had no limitations sitting, moderate limitations standing, walking, pushing, pulling, lifting and carrying, and should avoid bending due to neck pain and back pain. (*Id.*) Due to asthma, he also recommended that Tanya avoid smoke, dust and other respiratory irritants or triggers. (*Id.*)

### 2.    August 12, 2019 Psychiatric Evaluation – Jody Popple, Ph.D.

On August 12, 2019, Tanya saw psychologist Jody Popple, Ph.D., for a psychiatric evaluation. (R. 563-68.) Tanya complained that she woke up approximately four times a night due to anxiety, and was experiencing a decrease in appetite. (R. 564.) Tanya also reported that she struggled to be around people, and felt anxious, restless and sometimes irritable. (*Id.*) In addition, she had trouble taking public transportation on her own. (*Id.*) Approximately twice a

day, Tanya reported she would sweat or tremble, and experienced chest pain and difficulty breathing, in episodes that could last 20-30 minutes. (*Id.*) In a mental status examination, Dr. Popple noted that Tanya's demeanor was cooperative, and that she had an adequate manner of relating. (R. 565.) Dr. Popple reported that Tanya had displayed normal thought processes but had an anxious mood and affect, and refused to attempt several cognitive exercises, stating that she could not complete them, although she was able to after some encouragement. (*Id.*) Dr. Popple reported that Tanya's recent and remote memory skills were intact, her cognitive functioning within the average range, and her insight and judgment fair. (R. 566.) Dr. Popple noted moderate limitations in Tanya's ability to regulate emotions, control behavior and maintain well-being, but these limitations were not significant enough to interfere with her ability to function on a daily basis. (R. 567.)

### 3. September 4, 2019 Mental Residual Functional Capacity Assessment – C. Walker, Ph.D.

On September 4, 2019, Dr. Walker provided an RFC assessment for Plaintiff. (R. 115-18.) Dr. Walker found that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (R. 116-17.) With respect to sustained concentration and persistence, Dr. Walker stated: "The claimant may have occasional lapses in focus and motivation, however, the most recent clinical note indicates that the [claimant] has the capacity to manage daily living and sustain a routine." (R. 118.)

22

### 4. **November 20, 2019 Psychiatric Evaluation – M. Butler, Ph.D.**

On November 20, 2019, Dr. Butler provided a psychiatric evaluation for Plaintiff. (R. 164-67; *see also* R. 143-44.) Dr. Butler found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. (R. 164-65; *see also* R. 144.) With respect to sustained concentration and persistence, Dr. Butler stated: "The claimant may have occasional lapses in focus and motivation, however, the most recent clinical note indicates that the [claimant] has the capacity to manage daily living and sustain a routine." (R. 166.)

### IV. **June 24, 2020 Administrative Hearing**

#### A. **Plaintiff's Testimony**

During the June 24, 2020 administrative hearing, Tanya testified that she did not go out of her house because she did not like being outside. (R. 38-39.) She also stated that she had anxiety, and described experiencing panic attacks every two days, triggered by going outside or being in a crowd of people. (R. 39-40.) Tanya described having to give up her job at a nutritionist's office because being around other people triggered constant panic attacks. (R. 46.) Tanya said she did not socialize with anybody except her boyfriend, who came over to her house every day to help take care of her eight-year-old son. (R. 38, 41.) Tanya explained that the father of her son had abused her, and that she therefore had full custody and an order of protection against him for the last three years. (R. 43.) With respect to her physical limitations, Tanya testified that she

suffered from carpal tunnel syndrome in both hands, swollen feet, chronic asthma and chronic arthritis in the back and neck. (R. 44.)

### B.    Medical Expert Testimony

Billings Fuess, Ph.D. testified at the hearing. (R. 48-52.) Dr Fuess testified, after reviewing the records in this case, that Tanya was diagnosed as having major depressive disorder, generalized anxiety disorder, panic disorder and agoraphobia. (R. 48-49.) Dr. Fuess also testified that the examining physicians had given Tanya a Global Assessment of Functioning ("GAF") score of 60, which would indicate Tanya was at the upper range of moderate in terms of function and psychiatric symptoms. (R. 49.) Dr. Fuess could not find documentation pointing to limitations in Tanya's ability to understand, remember and apply information. (R. 50.) Dr. Fuess noted that the medical examiner whose notes he reviewed opined "mild limitations" and described Tanya as cooperative, attentive, communicative and friendly. (*Id.*) Taking all this, along with her hearing testimony, into consideration. Dr. Fuess opined that overall, Tanya would have moderate limitations interacting. (*Id.*)

Based on notes from treatment providers, Dr. Fuess noted a conflict between those that indicated Tanya was attentive, and those that indicated she had attentive difficulties or a short attention span. (R. 51.) He noted that in a mental status exam, Tanya was described as having no limitations in terms of sustaining concentration or pace for simple or complex tasks. (*Id.*) Overall, Dr. Fuess deemed Tanya to have mild to no more than moderate limitations in this area. (*Id.*) Dr. Fuess also deemed Tanya to have a moderate overall level of functioning, stating that she would be able to do a simple-task job with only occasional contact with supervisors, coworkers and the public. (*Id.*) Dr. Fuess confirmed that, due to Tanya's panic attacks and shortness of breath, it was

24

possible that she would be unable to function at work or be either late to or absent from work. (R. 54.) But, Dr. Fuess noted, Tanya could still be capable of attending work if she worked in an environment where she had only occasional contact with other people. (R. 54.)

### C.    Vocational Expert Testimony

VE Fosberg also testified at the hearing. (R. 56-61.) VE Fosberg identified Tanya's past relevant work as a weight reduction specialist (Dictionary of Occupation Titles ("DOT") Code 359.367-014). (R. 59.)[8] The ALJ then asked VE Fosberg to assume a hypothetical individual with the same age, education and past work experience as Tanya, who was limited to a simple-task, sedentary job with at the most occasional contact with supervisors, coworkers and the public, no concentrated chemicals or pollutants, and only occasional stooping, crouching and bending, but no crawling. (R. 60.) VE Fosberg testified that, based upon those limitations, there were other jobs in the national economy that such an individual could perform, including assembler (DOT Code 713.687-018), inspector (DOT Code 669.687-014) and labeler (DOT Code 017.684-010). (*Id*.)

VE Fosberg further testified that, based upon his vocational opinion and experience, an individual could be off task outside of regularly scheduled breaks up to ten percent of the time. (R. 60.) VE Fosberg also testified that an individual could not be absent even one or more times per month on an ongoing monthly basis before they were deemed unable to work. (*Id.*)

### V.    ALJ Grossman's August 6, 2020 Decision

In a decision dated August 6, 2020, applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, ALJ Grossman found at step one that Tanya had

---

[8] Tanya's position was so identified even though Tanya clarified during the hearing that she had worked as a manager at a nutritionist's office. *See* footnote 3, *supra*.

not engaged in substantial gainful activity since December 2, 2017, the alleged onset date. (R. 814). At step two, the ALJ determined that the following impairments were severe: a spine impairment, anxiety disorder, panic disorder and depressive disorder. (R. 815.) At step three, the ALJ found that Tanya did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.) The ALJ specifically considered listings in sections 1.02, 1.04, 12.04 and 12.06. (*Id*.) With respect to the paragraph B criteria, the ALJ found that Tanya had a mild limitation in understanding, remembering, or applying information, a moderate limitation in interacting with others, a mild limitation in concentrating, persisting and maintaining pace and a moderate limitation in adapting or managing oneself. (R. 816.)

The ALJ then assessed Tanya's RFC, determining that she could perform sedentary work, except that she was limited to only occasional stooping, crouching and bending, no crawling and no concentrated exposure to chemicals or pollutants, that she could perform simple tasks, and that she was limited to only occasional contact with supervisors, coworkers and the public. (R. 817.) Moving on to step four, the ALJ found that Tanya was unable to perform her past relevant work as a weight reduction specialist. (R. 821.) At step five, the ALJ considered Tanya's age, education and job skills, along with the RFC determination, and based on testimony from the VE, concluded there were jobs that exist in significant numbers in the national economy that Tanya could perform, including assembler, inspector and labeler. (R. 821-22.) Therefore, the ALJ found that Tanya was not disabled during the relevant period and denied her claim for benefits. (R. 823.)

**VI.    June 27, 2022 Appeals Council Order**

On June 27, 2022, the Appeals Council issued an order remanding the case to the ALJ. (R. 804-06.) Alongside a request that the ALJ reevaluate "the claimant's work-related mental limitations in the [RFC] assessment" (R. 805), the Appeals Council directed the ALJ to "[f]urther evaluate whether [Tanya's] chronic venous insufficiency and carpal tunnel syndrome are medically determinable impairments, and, if so, the nature, and severity of, and functional limitations resulting from those impairments" and to "[g]ive further consideration to [Tanya's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations." (R. 805-06.) The Appeals Council also directed the ALJ to engage a VE to provide supplemental evidence on how the new assessed limitations would impact Tanya's occupational base. (R. 806.)

**VII.    June 17, 2024 Administrative Hearing[9]**

**A.    Medical Expert Testimony**

**1.    Dr. James Haynes**

Dr. James Haynes testified at the June 17, 2024 hearing, noting Tanya's claims of neck and back pain, and headaches. (R. 764.) After reviewing the records in this case, Dr Haynes reported that imaging showed some age-appropriate changes to the spine, a normal electrical study of the lower extremities, and occasional headaches that fluctuated but were largely under control. (*Id.*) Dr. Haynes noted that objective findings on a physical basis were lacking, and that there was no significant neurological diagnosis. (*Id.*) With respect to Tanya's carpal tunnel diagnosis, Dr.

---

[9] Tanya did not appear at the June 17, 2024 administrative hearing.

Haynes noted that Tanya had an electrical study showing lowering of the median nerve across the wrist, indicating an electrical abnormality, which is not the same as carpal tunnel. (*Id.*) Such an abnormality would require a focused exam to the hand to test for strength and sensation, as well as manipulative abilities and provocative maneuvers, Dr. Haynes opined, but the absence of such a test from the record was not notable, since there is no physical examination to confirm carpal tunnel, and carpal tunnel is not considered a disability. (*Id.*)  Dr. Haynes also confirmed no physical examination to confirm carpal tunnel, with incidental findings not correlating with clinical findings. (R. 765-66.) Similarly, he stated that objective studies do not often reveal the presence of migraines, although they may sometimes be detected through their accompanying symptoms, such as fainting or nausea. (R. 766.) Dr. Haynes noted, however, that Tanya's headaches had gone over time from sporadic to infrequent to under control. (*Id.*) He also noted that an electrical study of the lower extremities showed no abnormalities, and that standing and walking should not be restricted. (R. 764.)

In response to the ALJ's questioning, Dr. Haynes confirmed that Tanya should be able to do light work that included occasional bending, stooping, crouching and kneeling, but no crawling. (R. 765.) The ALJ also confirmed there was no restriction on Tanya's ability to stand and walk a total of six hours within an eight-hour day, with normal breaks, or her ability to lift and carry ten pounds up to six hours in a day, and twenty pounds up to two hours in a day. (*Id.*)

### 2.    Dr. Rujvi Dileep Kamat

Dr. Kamat also testified at the June 17, 2024 administrative hearing, noting ongoing tensions of anxiety and panic that satisfied criterion A of 12.06, but not criterion B, based on the records available. (R. 767.) Dr. Kamat also noted some documentation of ongoing panic, and

social situations that might be expected to impact concentration and her ability to regulate her emotions, but no limitations with understanding. Dr. Kamat also opined that there were only moderate limitations with interacting, concentrating and maintaining pace, and mild limitations with adapting. (R. 768.) Dr. Kamat confirmed that Tanya's symptoms could fluctuate from day to day, but that her panic attacks typically lasted five to ten minutes. (R. 769.) Dr. Kamat noted that panic attacks of this duration typically do not require those who suffer from them to forego an entire day of work, but may cause sufferers to be late to work if they have trouble leaving the house. (*Id*.) In response to the ALJ's questioning, Dr. Kamat confirmed that Tanya should be able to do a simple-task job with at most occasional contact with supervisors, coworkers and the public, and no fast-paced quotas. (R. 768.)

**B.      Vocational Expert Testimony**

VE Christina Boardman also testified at the June 7, 2025 administrative hearing. (R. 770-74.) The ALJ's hypothetical to her posited that Tanya could perform light work, with a limitation to frequent handling, fingering and reaching, including occasional bending, stooping, kneeling and crouching, but no crawling, and with no fast-paced quotas. (R. 771.)

VE Boardman testified that, based upon those limitations, there were other jobs in the national economy that such individual could perform, including marker (DOT Code 209.587-034), routing clerk (DOT Code 222.687-022) and office helper (DOT Code 239.567-010), as well as a sedentary job, document preparer (DOT Code 249.587-018). (R. 771-72.) VE Boardman further testified that, based upon her vocational opinion and experience, an individual could be off task outside of regularly scheduled breaks up to fourteen percent of the time. (R. 772.) VE Boardman also testified that an individual could be absent once a month and still keep these jobs (*Id.*)

29

However, a thirty-minute to one hour delay in arrival could be considered an absence. (R. 773.) Because these were unskilled jobs, VE Boardman opined, flex time would not be allowed. (*Id.*)

**VIII.    ALJ Grossman's September 10, 2024 Decision**

In his September 10, 2024 decision, applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, ALJ Grossman found at step one that Tanya had not engaged in substantial gainful activity since December 2, 2017, the AOD. (R. 738.) At step two, the ALJ determined that Tanya had the following severe impairments: cervical spine impairment, lumbar spine impairment, carpal tunnel syndrome, chronic venous insufficiency, headaches, panic disorder and depressive disorder. (*Id.*)

At step three, the ALJ found that Tanya did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 738.) With respect to Tanya's mental impairments, the ALJ specifically considered listings 12.04 and 12.06. (R. 739.) As to paragraph B criteria, the ALJ found that Tanya's mental impairments caused no limitations in understanding, remembering or applying information or in adapting and managing oneself, and moderate limitations in interacting with others and in concentrating, persisting or maintaining pace. (R. 740.) The ALJ then addressed paragraph C criteria, finding that the evidence "fails to establish . . . that [Tanya] has had a 'serious and persistent' mental disorder, which existed over a period of two years" or that she "has had medical treatment, mental health therapy, psychosocial supports or a highly structured setting that is ongoing and that diminishes symptoms and signs of her mental disorder." (R. 740-41.) Furthermore, Tanya failed to satisfactorily make a showing that she had

30

"only marginal adjustment, that is, a minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." (R. 741.)

Then, the ALJ found that Tanya retained the RFC to perform light work, except that she could frequently, but not constantly, handle, finger and reach. (R. 741.) The ALJ also found that she occasionally could bend, stoop, kneel and crouch, but could not crawl, and that Tanya was limited to only occasional contact with supervisors, coworkers and the general public, and could have no fast-paced quotas. (*Id.*)

At step four, the ALJ found that Tanya was unable to perform any past relevant work. (R. 746.) At step five, the ALJ considered Tanya's age, education, work experience and RFC and concluded that there were jobs existing in significant numbers in the national economy that Tanya could perform, including marker (DOT Code 209.587-034), routing clerk (DOT Code 222.687-022) and office helper (DOT Code 239.567.010). (R. 748.) Accordingly, the ALJ found that Tanya was not disabled between December 2, 2017 (*i.e.*, the AOD) and September 24, 2024 (*i.e.*, the date of the decision). (*Id.*)

## **LEGAL STANDARDS**

### I.   **Standard Of Review**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan.

31

7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id*. (internal citation omitted); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise.*" *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    Determination Of Disability

A person is considered disabled for benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . " 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that he cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52; *see also Pines v. Comm'r of Soc. Sec.*, No. 13-CV-06850 (AJN) (FM), 2015 WL 872105, at *3 (S.D.N.Y. Mar. 2, 2015), *report and recommendation adopted*, 2015 WL 1381524 (S.D.N.Y. Mar. 25, 2015). If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The ALJ must apply a "special technique" at the second and third steps to evaluate alleged mental impairments. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). The special technique first requires the ALJ to assess the claimant's degree of functional limitation resulting from a mental impairment in four "broad functional areas" identified in the "paragraph B" of the adult mental disorders listings. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Those four functional areas are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.*

### III.    Regulations Regarding Consideration Of Medical Opinions And Prior Findings For Applications Filed On Or After March 27, 2017

Under the regulations applicable to Plaintiff's claim, the ALJ considers five factors in evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* §§ 404.1520c(b), 416.920c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the

35

more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings . . . ." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added). An ALJ must provide sufficient explanation to allow a reviewing court to "trace the path of [the] adjudicator's reasoning[.]" *Amber H. v. Saul*, No. 20-CV-00490 (ATB), 2021 WL 2076219, at *6 (N.D.N.Y. May 24, 2021) (quoting *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01, at 5858 (Jan. 18, 2017) ("We expect that the articulation requirements in these final rules will allow a . . . reviewing court to trace the path of an adjudicator's reasoning[.]")). An ALJ commits procedural error by failing to explain how he considered the supportability and consistency of medical opinions in the record. *See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022). A reviewing court still may affirm if "a searching review of the record" assures it "that the substance of the [regulation] was not traversed." *Id.* (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)).

## DISCUSSION

In support of remand, Plaintiff argues that the ALJ failed to properly consider (1) the opinions of Dr. Nunez and Dr. Ravi; (2) Plaintiff's number of monthly absences and time off task;

and (3) Plaintiff's various impairments and how they were incorporated into the RFC. (*See* Pl.'s Mem., ECF No. 15, at 18-27.) For the reasons set forth below, the Court finds that Plaintiff's arguments lack merit.

I.    **ALJ's Evaluation Of Medical Evidence From Dr. Nunez And Dr. Ravi**

Plaintiff challenges the ALJ's evaluation of the medical evidence from two physicians: Dr. Nunez, who was Plaintiff's treating psychiatrist, and Dr. Ravi, who was a consultative examiner. The Court considers each physician separately.

A.    **Dr. Nunez**

Plaintiff first argues that two letters from Dr. Nunez regarding Plaintiff's treatment, dated May 3, 2019 and May 22, 2023, reflect Dr. Nunez's medical opinions, and that the ALJ failed to consider such opinions. (*See* Pl.'s Mem. at 18-19.)

The Court agrees with the Commissioner (*see* Comm'r's Br. at 18) that neither of the two letters from Dr. Nunez to which Plaintiff refers in her memorandum qualify as medical opinions under the regulations. *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). According to the regulations, a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in" the ability to perform the mental or physical demands of work activities. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2)

The May 3, 2019 letter states in its entirety:

The above referred patient is a 43 years old female, she is under my care since for her diagnosis of (F41.9) Anxiety disorder; (F41.0) Panic disorder [episodic paroxysmal anxiety] without agoraphobia. Panic attack. Panic state (Active), she follows treatment for her condition with psychotherapy and medication management, she has been prescribed #1) Ambien 10 mg PO QHS #2) Clonazepam

1 mg PO BID, #3) Seroquel 100 mg , #4) Zoloft 100 Two QAM, She continues to need ongoing psychiatric treatment.

If you need further information, please contact this office with a written consent.

(R. 399.)

The May 22, 2023 letter appears to have been written for the purpose of having Plaintiff moved to a different apartment due to the death of family members in an apartment next door. (*See* R. 1364.) After the first paragraph of the letter, which recites Plaintiff's diagnosis and the medications that she is taking, the letter states:

Patient reported to this MD, that last week there was a fire next to her apartment where her grandmother and cousin lived and they both were killed. This has caused a detrimental effect on her mental health. She is having daily panic attacks and extreme depression with anxiety.

I recommend that TANYA ROSADO is moved to a different location/ apartment building as soon as possible for her safety and for her well being. She has been experiencing increased symptoms of her health condition and it has been deteriorating her.

Mrs. Rosado meets the definition of disability under the Americans with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act of 1973. Her conditions are chronic and expected to last indefinitely.

I thank you in advance[] for assisting my patient on this matter. If you need further information, please contact this office with patient written consent.

(R. 1383.)[10]

Neither of the foregoing letters contains statements about what Plaintiff still can do despite her impairments or references limitations in her ability to perform work activities. Thus, the letters do not contain medical opinions and the ALJ did not err in failing to consider them as

---

[10] Under the three federal statutes referred to in the text of Dr. Nunez's letter, a person with a disability who lives in public housing can request relocation as a reasonable accommodation. *See Logan v. Matveevskii*, 57 F. Supp. 3d 234, 256 (S.D.N.Y. 2014).

such. *See e.g. Talisha M. v. Comm'r of Soc. Sec.,* No. 1:24-CV-00648-MAV, 2025 WL 2753158, at *5 (W.D.N.Y. Sept. 26, 2025) ("the medical record does not contain an assessment about what Plaintiff is still capable of doing despite the edema, as would be required for the record to be considered a medical opinion"); *see also Kathleen M. v. Comm'r of Soc. Sec.*, No. 8:20-CV-01040 (TWD), 2022 WL 92467, at *7 (N.D.N.Y. Jan. 10, 2022) (finding doctor's letter was not "medical opinion" "because it [did] not address what [p]laintiff could still do despite her impairments").

Plaintiff argues in the alternative that, even if Dr. Nunez's letters do not amount to medical opinions, the ALJ should have supplemented the record by soliciting information from Dr. Nunez about how Tanya's psychiatric diagnosis would affect her work. (*See* Pl.'s Mem. at 18-19.) But the need for a medical source's statement is not absolute; rather, it relies upon "[the] circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *See Edwards v. Comm'r of Soc. Sec. Admin.*, No. 22-CV-04345 (RWL), 2023 WL 6173526, at *12 (S.D.N.Y. Sept. 22, 2023) (quoting *Sanchez v. Colvin*, No. 13-CV-06303 (PAE), 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015)).

In the Second Circuit, an "ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alteration in original) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009)). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id*. at 112-13 (citation omitted) (alteration in original). However, the duty to develop the record is "not absolute," and requires "the ALJ only to ensure that the record contains

39

sufficient evidence to make a determination." *Bussi v. Barnhart*, No. 01-CV-04330 (GEL), 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003). The record contains sufficient evidence if it is "robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability." *Sanchez v. Colvin*, No. 13-CV-06303 (PAE), 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015) (citations omitted). An ALJ's determination may be upheld where the record is "adequate to permit an informed finding." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

In the present case, the ALJ did not have a duty to develop the record by contacting Dr. Nunez because the evidence in the record was "complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." *Blachorsky v. O'Malley*, No. 23-CV-07401 (VF), 2024 WL 4144040, at *7 (S.D.N.Y. Sept. 11, 2024). The ALJ had access to the medical opinion of consultative examiner Dr. Ravi, who was able to interview and observe Plaintiff, as well as perform an internal medical examination during which he noted her stated impairments and their corresponding physical presentation. (R. 743-44.) The ALJ also had access to the medical opinion of Dr. Popple, who met with Plaintiff for a psychiatric examination and reported on her mental limitations. (R. 744.) The ALJ had access to the opinions of four physicians – Dr. Walker, Dr. Butler, Dr. Auerbach and Dr. Lee – who reviewed the record as well as each other's assessments of Plaintiff's limitations. Lastly, ALJ had the hearing testimony of Dr. Haynes and Dr. Kamat to reply upon, both of whom had the benefit of reviewing the record in its most recent form. (R. 744-45.)

The ALJ's discussion of Dr. Nunez's progress notes[11] reflects that he regarded them as aligning with the medical opinions of consulting physicians and medical examiners that were included in the record, and highlights no obvious gaps or inconsistencies that would necessitate recontacting Dr. Nunez under 20 C.F.R. § 404.1520b(b). Accordingly, the Court finds that the ALJ did not err by failing to supplement the record by contacting Dr. Nunez.

B.    **Dr. Ravi**

Plaintiff argues that the ALJ failed to properly consider the assessment of Dr. Ravi, the consultative examiner. (Pl.'s Mem. at 20-21.) The following is what the ALJ stated in his decision regarding Dr. Ravi:

> The claimant met Dr. Ravi for an internal medicine examination on August 12, 2019. The claimant complained of neck pain and back pain (Exhibit B11F/2). In a physical examination, the claimant had a moderately antalgic gait and was unable to walk on toes and heels, and had discomfort with standing, but used no assistive devices (Exhibit B11F/3). However, an examination of the chest and lungs showed normal results. The claimant had a limited range of motion in the cervical spine and declined a lumbar spine examination and straight-leg raising test due to pain. The claimant had a reduced range of motion in the shoulders, knees and ankles but had 5/5 strength in the upper and lower extremities. The claimant was noted to have 5/5 strength in the upper and lower extremities, and to have intact hand and finger dexterity and to have 5/5 grip strength (Exhibit B11F/3-4). Dr. Ravi opined that the claimant had no limitations sitting, but had moderate limitations standing, walking, pushing, pulling, lifting and carrying, and should avoid bending due to neck pain and back pain. He also opined that the claimant should avoid smoke, dust and other respiratory irritants or triggers due to asthma (Exhibit B11F/4).
>
> The undersigned finds Dr. Ravi's opinions to be only somewhat persuasive. Dr. Ravi's opinions are somewhat supported by his own examination and by the record, which shows that the claimant's physical examination caused her

---

[11] The ALJ stated: "The claimant was treated through therapy and through various medications. (Exhibits . . . B13F, B14F, B15F, B17F, B19F . . .). Taken together, the notes do show that the claimant does have some degree of anxiety but also has a generally good mental status. The notes indicate that the claimant should be able to do a simple task job, and perhaps more." (R. 743.)

exertional and non-exertional physical limitations, although the record and his examination does not support no bending, since there are no physical examinations that showed that the claimant was not able to bend at all. Regardless, the undersigned has limited the claimant to occasional bending. Further, the record does not support his opinions of respiratory limitations, since as explained above, the claimant's asthma was a non-severe impairment. I also note that the term "moderate" is not defined and is therefore consistent with my ultimate decision but also can be interpreted to preclude light work. Therefore the opinion, as such, has only limited value.

(R. 743-44.) Specifically, Plaintiff points to the ALJ's remark above that the term "'moderate' is not defined" (R. 744) to argue that the ALJ should have contacted Dr. Ravi in order to clarify Dr. Ravi's use of the term "moderate." (Pl.'s Mem. at 20.)

"The duty to recontact arises only if the ALJ lacks sufficient evidence in the record to evaluate the doctor's findings. . . . Where the record before the ALJ is complete enough to form a determination as to plaintiff's disability, the ALJ is not required to recontact a medical source." *Raftis v. Comm'r of Soc. Sec.*, No. 5:17-CV-0514 (WBC), 2018 WL 1738745, at *6 (N.D.N.Y. Apr. 6, 2018) (citing *Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017)).[12]

Terms such as "mild" and "moderate" are employed in the regulations as a means of rating a claimant's degree of functional limitation when evaluating mental impairments. *See* 20 C.F.R. § 416.920a(c)(4) ("When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate,

---

[12] The cases Plaintiff cites in support of her argument that the term "moderate" should necessitate recontact (*see* Pl.'s Mem. at 21) are distinguishable. In *Selian v. Astrue*, the term "mild degree" with which the Court took issue referred to the amount of weight the doctor opined the Plaintiff could lift, not the degree of the limitations a doctor assessed after examining a patient, as in Plaintiff's case. 708 F.3d 409, 421 (2d. Cir 2013). In *Garcia v. Comm'r of Soc. Sec.*, the Court highlighted the doctor's "use of vague language" as an addendum to their primary issue, which was that the two doctors in question had rendered a medical opinion without having considered critical test results. No. 22-CV-02449 (FB), 2023 WL 4904751, at *3 (E.D.N.Y. Aug. 1, 2023).

marked, and extreme."). "[A] medical source's use of 'mild' or 'moderate' when describing work-related limitations does not automatically render the assessment so vague that it is useless without clarification." *Arus L. G. v. Comm'r of Soc. Sec.*, No. 21-CV-01112 (JJM), 2023 WL 5198792, at *4 (W.D.N.Y. Aug. 14, 2023) (quoting *Ayesha W. v. Comm'r of Soc. Sec.*, No. 20-CV-06827 (DB), 2022 WL 1308166, *10 (W.D.N.Y. 2022)). This is true especially where, as here, the consulting examiner offers much greater medical detail to illustrate or clarify his use of such terms. *See Tankisi*, 521 F. App'x at 34 ("Although [the claimant] challenges [consulting physician]'s opinions as 'incomplete and vague,' the opinions, coupled with the other medical evidence, were sufficient to support the inference drawn. [The consulting physician] did not simply describe [claimant's] condition as 'mild to moderate'; he provided additional clarifying information" (internal citations omitted)). Additionally, the ALJ found Dr. Ravi's opinion to be only somewhat persuasive, relying more heavily on the opinions of other consulting examiners and medical experts. (*See* R. 445 (finding the opinions of Dr. Auerbach and Dr. Lee to be "mostly persuasive" and the opinion of medical expert Dr. Kamat to be "persuasive").)

Accordingly, the Court finds that the ALJ did not have an obligation to recontact Dr. Ravi.

## II.    ALJ's Consideration Of Plaintiff's Monthly Absences And Time Off Task

Plaintiff argues that the ALJ erred in failing to consider the testimony of VEs Fosberg and Boardman at the June 24, 2020 and June 17, 2024 hearings, respectively, when accounting for the monthly absences and time off-task permitted. (Pl.'s Mem. at 21-23; Pl.'s Reply Mem. at 3.) This argument lacks merit, and fails to take into account when and how the ALJ is required to incorporate a VE's testimony into the ALJ's overall determination.

The ALJ determines a claimant's RFC at step four of the sequential process. In determining the RFC, the ALJ "should address a treating physician's opinion regarding absences, daily breaks, and time off-task." *Reid v. Berryhill*, No. 18-CV-00255 (LTS) (RWL), 2018 WL 8545835, at *14 (S.D.N.Y. Dec. 20, 2018), *report and recommendation adopted*, 2019 WL 1284275 (S.D.N.Y. Mar. 20, 2019) (citing *See Rugless v. Commissioner*, 548 F. App'x 698, 700 (2d Cir. 2013).

At step five of the sequential process:

the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform. An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert. An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion, and accurately reflect the limitations and capabilities of the claimant involved.

*McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (internal quotations and citations omitted). A Court will not find error sufficient for remand where, as here, the hypotheticals posed to the VE were created with an RFC that was based on substantial evidence. *See Phelps v. Colvin*, 20 F. Supp. 3d 392, 406 (W.D.N.Y. 2014). "The vocational expert is just that, a vocational expert. The ALJ is responsible for determining, based on all the evidence, the claimant's physical capabilities." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983).

In the present case, the ALJ correctly determined Plaintiff's RFC after an evaluation of the evidence in the record, ultimately determining that Plaintiff "ha[d] the residual functional capacity to perform light work" based on the assessment of several objective medical examiners the ALJ found to be mostly or generally persuasive, as well as medical experts who testified at both hearings. (R. 741-45.) The hypotheticals the ALJ posed to VE Boardman then were based on the RFC the ALJ properly had assessed, and thus the VE's example jobs were in response to that

hypothetical. (R. 771.) The ALJ's only inquiry regarding absences and time-off task related to the example jobs or "titles" the VE had presented in testimony (*Id*.)  Accordingly, the ALJ did not err in his assessment of the testimony of VE Boardman and VE Fosberg.

To support Plaintiff's argument regarding the ALJ's purported failure to consider her number of monthly absences and time off-task, Plaintiff also refers to the opinions of psychiatric consultants Dr. Walker and Dr. Butler who both found Plaintiff to have certain moderate limitations. (Pl.'s Mem. at 22.) However, Plaintiff ignores the statements made by both Dr. Walker and Dr. Butler that while Plaintiff "may have occasional lapses in focus and motivation . . . the most recent clinical note indicate[d] that [Plaintiff] ha[d] the capacity to manage daily living and sustain a routine." (R. 118, 166.)

Moreover, the ALJ considered the opinions of Dr. Walker and Dr. Butler in determining Plaintiff's RFC. The ALJ was somewhat persuaded by their assessments. (R. 744.) Although the ALJ was more persuaded by the opinions of Dr. Kamat, who assessed that Plaintiff would be capable of simple tasks without fast-paced quotas and with occasional social interaction, the ALJ found that Dr. Kamat's opinion was materially consistent with the assessments by Dr. Walker and Dr. Butler. (R. 745-46.)

Accordingly, the Court finds that the ALJ committed no error with respect to the opinions of Dr. Walker and Dr. Butler.[13]

---

[13] To the extent that Plaintiff argues the ALJ failed to consider how Plaintiff's headaches would affect her ability to stay on task or be absent (*see* Pl.'s Mem. at 22), the Court refers to its analysis in Discussion Section III.D., *infra*.

**III.     ALJ's Consideration of Plaintiff's Severe and Non-Severe Impairments**

Plaintiff argues that the ALJ failed to consider several of Plaintiff's severe and non-severe impairments when making his RFC finding. (Pl.'s Mem. at 22, 25-27.) These include asthma, which the ALJ found was a non-severe impairment, as well carpal tunnel syndrome, chronic venous insufficiency, headaches and panic disorder, which the ALJ found were severe impairments. (*Id.*) The Court considers these impairments in turn.

**A.     Plaintiff's Asthma**

Plaintiff argues that the ALJ did not properly consider her asthma when making his determination of the RFC, after finding it to be a non-severe impairment at step two. (Pl. Mem. at 24-25.) Plaintiff appears to suggest that an ALJ is obligated to impose limitations on a claimant's RFC due to every severe or non-severe impairment. (*Id.*) But incorporating a non-severe impairment into an RFC determination, to the extent that additional limitations are imposed, is not the same as merely considering one, and an ALJ is only required to do the latter. *See* 20 C.F.R. § 404.1545 (ALJ is required to consider "all . . . medically determinable impairments of which we are aware, including . . . medically determinable impairments that are not 'severe,' when [assessing] residual functional capacity") (internal citations omitted); *see also Acevedo v. Saul*, 577 F. Supp. 3d 237, 247 (S.D.N.Y. 2021). As long as an ALJ's decision contains evidence that the ALJ "carefully considered" certain limitations resulting from a claimant's impairments, such a decision will not be overturned simply because the ALJ concluded that such limitations were mild or *de minimis*. *See id.* (citing *Michelle B. v. Comm'r of Soc. Sec.*, 5:20-CV-00332 (DNH), 2021 WL 3022036, at *7 (N.D.N.Y. July 16, 2021) (upholding ALJ's RFC analysis considering claimant's mental impairments but not including them in RFC itself).

46

Here, the ALJ considered Plaintiff's asthma in reaching his RFC determination, addressing the medical opinions of several physicians, including Dr. Ravi, Dr. Lee and Dr. Auerbach. (R. 743-45.) The ALJ noted Dr. Ravi's opinion that the "claimant should avoid smoke, dust and other respiratory irritants or triggers due to asthma," and Dr. Auerbach's opinion that she "had to avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation. (*Id*.) The ALJ also noted that Dr. Lee affirmed Dr. Auerbach's opinion, after reviewing the record. (R. 745.) The ALJ explained in his decision why he found that Plaintiff's asthma did not result in any significant restrictions on her ability to perform basic work activities. (R. 738.) There is substantial evidence to support this finding, including evidence from Dr. Haynes, who did not assess any such restrictions. (*See* 745, 764-65.)

Because the ALJ considered Plaintiff's asthma in making his RFC determination, he did not commit any error. *See Catherine Jean D. v. Comm'r of Soc. Sec.*, No. 20-CV-01581 (FPG), 2022 WL 4115367, at *3 (W.D.N.Y. Sept. 9, 2022) ("the law only requires the ALJ to *evaluate* non-severe impairments in the RFC analysis, not to include limitations in the RFC" (emphasis in original)).

### B.    Plaintiff's Carpal Tunnel Syndrome

Plaintiff argues that the ALJ erred in finding that Plaintiff could "frequently handle, finger, and reach," while also finding that carpal tunnel syndrome was a severe impairment. (Pl.'s Mem. at 25 (citing R. 738, 741).) Plaintiff argues that the ALJ therefore must have failed to properly consider Plaintiff's carpal tunnel syndrome when making his RFC determination. (*See id*.)

In its June 27, 2022 Order remanding the case, the Appeals Council noted that the August 6, 2020 decision "d[id] not contain any evaluation of [Plaintiff's] carpal tunnel syndrome" and that her carpal tunnel syndrome was not considered at step two of the sequential evaluation. (R.

47

805.) After remand, in his September 10, 2024 decision, the ALJ evaluated Plaintiff's carpal tunnel syndrome, as required, including in assessing Plaintiff's RFC. (R. 738, 742-43.)

The ALJ noted that medical opinions discussed Plaintiff's carpal tunnel syndrome, but found that "the record lack[ed] any physical examinations showing that any carpal tunnel impairment is more than mild." (R. 743.) For example, the ALJ referenced Dr. Ravi's opinion that "[t]he claimant was noted . . . to have intact hand and finger dexterity and to have 5/5 grip strength" (R. 743), and Dr. Auerbach's and Dr. Lee's opinions that "the claimant's EMGs show that the claimant also warrants manipulative limitations fingering and feeling." (R. 745.) The ALJ found Dr. Ravi's medical opinions to be "of limited value." (R. 744.) The ALJ found Dr. Auerbach's and Dr. Lee's medical opinions to be "mostly persuasive" (R. 745).

In his RFC assessment, the ALJ found that Plaintiff "can frequently, but not constantly, handle, finger and reach."[14] (R. 741.) The ALJ's decision takes into consideration the medical opinions discussing Plaintiff's carpal tunnel syndrome and imposes mild limitations not inconsistent with his consideration of the medical opinions and his weighing of their persuasiveness. (R. 741-45.)

Accordingly, the ALJ did not err in his consideration of Plaintiff's carpal tunnel syndrome. *See Femminella v. Comm'r of Soc. Sec.*, 524 F. Supp. 3d 20, 22 (E.D.N.Y. 2021) (upholding ALJ's RFC assessment even where ALJ "fail[ed] to recognize [claimant's] carpal tunnel syndrome (which

---

[14] Plaintiff also argues (*see* Pl.'s Mem. at 25) that the ALJ's RFC finding of frequent reaching was inconsistent with Dr. Ravi's assessment that Plaintiff's "shoulder forward elevation [was] 90 degrees bilaterally and abduction 90 degrees bilaterally", and that Plaintiff had "moderate limitations" in pushing, pulling, lifting, and carrying." (R. 558-59.) However, substantial evidence supports the ALJ's finding. Dr. Ravi himself did not assess any reaching restriction. (*See* R. 559.) Nor did Dr. Lee, Dr. Auerbach or Dr. Haynes. (*See* R. 114, 129, 146, 162, 764-65.)

ha[d] some documentation in the record) as a severe impairment at step [two]" but "clearly considered" effects of such syndrome in RFC determination (emphasis omitted)).

### C.        Plaintiff's Chronic Venous Insufficiency

Plaintiff argues that, although the ALJ identified chronic venous insufficiency as a severe impairment, the ALJ's failure "to provide any limitations as a result of this severe impairment in his RFC or in the hypotheticals to the vocational experts" at the hearing was legal error. (Pl.'s Mem. at 26.) In its June 27, 2022 Order remanding the case, the Appeals Council tasked the ALJ with performing an evaluation of Plaintiff's chronic venous insufficiency at step two and, if found to be a medically determinable impairment, to consider its effect on the RFC. (R. 805.) At step two, the ALJ found that chronic venous insufficiency was a severe impairment. (*See* R. 738-39.)

In determining Plaintiff's RFC, the ALJ noted that Plaintiff was assessed for "idiopathic chronic venous hypertension of both extremities with inflammation," and given various medications as well as compression stockings to wear on a trial basis. (R. 742.) As with Plaintiff's asthma, just because the ALJ is required to consider a severe impairment does not mean he is required to incorporate its limitations in the RFC.

The Court finds that substantial evidence supports the ALJ's determination that no limitations were required based upon Plaintiff's chronic venous insufficiency. The record contains only a few treatment notes from December 2018 through March 2019 regarding this impairment. (R. 403-12.) The last treatment note indicated that ABI testing was normal. (R. 403.)  The most recent physical examination in the record, carried out by Dr. Gonjon and dated October 6, 2021, makes no mention of chronic venous insufficiency or the symptoms associated with it among an extensive list of assessments. (R. 1353-63.) Plaintiff's extremities are observed as being without

49

edema or deformities, and it is noted that she denied pain in her legs and feet (R. 1354), suggesting that the condition had improved in the interim. Moreover, at the June 17, 2024 hearing, Dr. Haynes testified that Plaintiff had had a "normal electrical study of the lower extremities," and that he "saw no reason to restrict" Plaintiff's ability to "stand and walk in an eight-hour day . . . a total of six hours with normal breaks." (R. 763-64).

Accordingly, the Court finds that the ALJ did not err in his consideration of Plaintiff's chronic venous insufficiency and that the RFC determination is supported by substantial evidence.

### D.    <u>Headaches</u>

Plaintiff argues that her headaches were not properly incorporated into the RFC assessment. (Pl. Mem. at 22.) However, the ALJ considered evidence in the record regarding Plaintiff's headaches, including that Plaintiff's complaints of headaches were "noted to be infrequent and only during her menstrual cycle" (R. 742), and that in response to such complaints, Plaintiff had undergone MRIs of the brain, on June 6, 2018 and June 12, 2018, which "showed no evidence of large mass or showed normal results." (*Id*.) According to the extensive treatment notes and the hearing testimony of Dr. Haynes, Plaintiff's headaches had gone from frequent to infrequent to only occurring during her menstrual cycle. (R. 766.) They had been treated with medication and did not come up in treatment notes past November 2018. (*Id.*) Accordingly, the ALJ properly considered Plaintiff's headaches, and substantial evidence supports the determination that Plaintiff's headaches did not require greater limitations in her RFC.

### E.      Panic Attacks

Plaintiff's arguments regarding Dr. Nunez's assessments of Plaintiff's panic attacks, to which Plaintiff returns at the end of her brief, similarly are without merit. (Pl. Mem. at 26.) Plaintiff states that the ALJ "erred in only finding that Plaintiff had mild limitations in adapting and managing oneself and not incorporating any limitations regarding this criteria in the RFC." (*Id.*) Yet the ALJ's discussion of his RFC assessment makes clear he has considered Plaintiff's mental impairments extensively, taking into account her treatment notes as well as the accounts of medical examiners and medical experts. (R. 743-45.) The ALJ concludes that Plaintiff's panic attacks had been subsiding more recently (R. 743), and his conclusion accords with Plaintiff's treatment notes, which show fewer and fewer reports of anxiety between March 2021 and May 2023, the most recent period for which treatment notes exist in the record. (R. 1295-1364.)

The ALJ states:

Treatment notes also show that the claimant was reported daily panic attacks and depression with anxiety (Exhibits B14F/4; B23F/1). However, a series of mental status examinations showed a normal mood and an appropriate affect, with no signs of hallucinations, delusions, bizarre behaviors or other indicators of psychotic process. Her associations were intact, her thinking was logical, her thought process was lineal and goal directed, and her thought content was appropriate. She also was cooperative, attentive and showed no gross behavior abnormalities.

Other examinations in the record are mostly normal and the records show a GAF of 60. A GAF score of 51 – 60 denotes moderate symptoms while 61-70 denotes mild symptoms. The claimant was treated through therapy and through various medications. Taken together, the notes do show that the claimant does have some degree of anxiety but also has a generally good mental status. The notes indicate the claimant should be able to do a simple task job, and perhaps more.

(R. 743 (internal citations omitted).)

51

The ALJ's limitation of Plaintiff to a "simple task job" is reflective of Plaintiff's mild to moderate limitations in areas of functioning, as documented in the medical opinions the ALJ considered. (R. 743-44.) The ALJ's further restriction that Plaintiff be "limited to only occasional contact with supervisors, co-workers and the public" properly takes into account Plaintiff's testimony in the June 24, 2020 hearing. (R. 40-41 ("If I go outside and I'm in a crowd I get a panic attack"; "I don't socialize with anybody").) The Second Circuit has affirmed ALJ decisions that connect moderate limitations to "simple tasks" or "simple task jobs." *See Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012) (rejecting Plaintiff's argument that ALJ's RFC determination was not supported by substantial evidence where ALJ found Plaintiff was "only mildly and moderately impaired by his depression and anxiety" and that Plaintiff "was capable of performing work that 'involved simple tasks and allowed for a low-stress environment'" and affirming the lower court's upholding of ALJ's decision). The ALJ thus properly took Plaintiff's panic attacks into account when determining the RFC.

Plaintiff also attacks the ALJ's use of mental status examinations and GAF scores in assessing Plaintiff's mental health limitations, arguing that the Second Circuit does not condone the use of the former and that the use of the latter is now outdated as it has been "dropped from [the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition] DSM-5 for several reasons[,] including its conceptual lack of clarity." (Pl.'s Mem. at 27.) But GAF scores still widely are relied upon and cited by ALJs in their decisions, and are found to be valid assessment tools as long as ALJs do not rely too heavily upon them. *See Bruzzese v. Comm'r of Soc. Sec.*, No. 23-CV-00171 (GS), 2024 WL 4345728, at *27 (S.D.N.Y. Sept. 30, 2024) ("By mentioning [GAF scores] as merely one factor among many in his evaluation of [the medical] opinions, the ALJ demonstrated

his understanding that 'GAF scores may be relevant to an ALJ's severity and RFC determinations, [but] they are intended to be used to make treatment decisions . . . and not disability determinations'")(quoting *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 569 n.3 (S.D.N.Y. 2018).

The cases Plaintiff cites find fault with mental status exams and GAF scores only where they conflict with the conclusions of other physicians on the record, which is not what occurred here. *See Bey v. Comm'r of Soc. Sec.*, No. 21-CV-07832 (KHP), 2023 WL 1098183, at *9 (S.D.N.Y. Jan. 30, 2023)(citing *Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, 11 (2d Cir. 2020) (finding it improper to rely on mental status evaluations to conclude that the plaintiff was capable of prolonged concentration while "ignoring the contrary conclusion of the very physicians who made the evaluations")); *see also Velez v. Saul*, No. 20-CV-05795 (AJN) (SN), 2022 WL 706530, at *12 (S.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, 2022 WL 705877 (S.D.N.Y. Mar. 9, 2022) (where ALJ mentioned but did not specifically rely on GAF scores, carefully weighed the medical opinion evidence and found that Plaintiff's claims of additional limitations were not consistent with the evidence, the ALJ did not err in her determination of "not disabled.").[15]

---

[15] Furthermore, the frequent use of GAF scores in opinions in this Court long past the date of publication of the DSM-5 suggests that they have not fallen out of favor, as Plaintiff argues. *See*, *e.g. Laguna v. Comm'r of Soc. Sec.*, No. 19-CV-06275 (PAE) (DF), 2021 U.S. Dist. LEXIS 44226, at *7 n.14 (S.D.N.Y. Mar. 8, 2021) (acknowledging that GAF scores were dropped from the DSM-5 yet continuing to reference them), *report and recommendation adopted*, 2021 WL 1725047 (S.D.N.Y. Mar. 23, 2021); *see also Grant v. Comm'r of Soc. Sec.*, No. 18-CV-05973 (KAM), 2020 U.S. Dist. LEXIS 95725, at *30 n.6 (E.D.N.Y. June 1, 2020) ("Defendant points to the DSM-5 eliminating the use of GAF scores in favor of the World Health Organization Disability Assessment Schedule as further evidence that Dr. Sherman's opinion does not provide objective evidence. However, the GAF can be reliable, valid, and sensitive to change over time and the American Psychiatric Association (APA) stated that its limitations are dependent on the rater's training." (internal citations omitted)).

The ALJ referred to the GAF scores in concluding that Plaintiff had "some degree of anxiety but also good mental status" and that "[t]he notes indicate [she] should be able to do a simple task job, and perhaps more." (R. 27.) This conclusion does not contradict the findings of Plaintiff's treating physicians or the weighted medical opinion evidence. Accordingly, the ALJ did not err in his assessment of Plaintiff's panic attacks, in referencing Plaintiff's mental status exams and GAF scores to support his assessment, or in his determination, supported by substantial evidence, that Plaintiff's panic attacks did not require greater limitations in the RFC.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion (ECF No. 14) is DENIED and the decision of the Commissioner is AFFIRMED. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:        New York, New York
              March 22, 2026

_____
STEWART D. AARON
United States Magistrate Judge